FAIRPARK, LLC; Tracy Hoskins; and Lori Celeste Hoskins, Appellants

v.

HEALTHCARE ESSENTIALS, INC.; Lawrence Williams; Timothy Scott; and Brynne Scott Williams, Appellees.

No. CA 10–772.

Court of Appeals of Arkansas.

Feb. 23, 2011.

Russell Charles Atchley, Fayetteville, for appellant.

Anthony William Noblin and Andrew T. Curry, Rogers, for appellee.

DAVID M. GLOVER, Judge.

This case involves the lease of commercial property in Fayetteville. In January 2008, appellees relinquished their tenancy prior to expiration of a five-year lease, claiming that appellants, as landlords, failed to repair the heating-and-air-conditioning system and failed to address excessive-noise issues involving an adjacent tenant. As a result, appellants sued appellees for the remaining rent due over the full lease term and to recover certain finish-out costs incurred at the beginning of the lease. The circuit judge, sitting as factfinder, found in favor of appellees and dismissed appellants' complaint. Appellants then moved for a new trial, which the circuit court denied, leading to this appeal. We find no abuse of discretion in the court's ruling and affirm.

## I. Facts

During the times relevant to this case, appellants Tracy Hoskins, Lori Celeste Hoskins, and Fairpark, LLC, owned the Fairpark Center in Fayetteville. The center is a large building containing several bays measuring approximately 1800 square feet each. In June 2006, Tracy Hoskins hired real-estate agent Clinton Bennett to lease the bays to commercial tenants. Because the bays were mere shells that required finishing out before occupancy, Hoskins told Bennett that he would provide an allowance of eight dollars per square foot, or approximately $14,400 per bay, to finish out the leased spaces.

In December 2006, appellees Lawrence Williams, Brynne Scott Williams, and Timothy Scott contacted Bennett to inquire about leasing warehouse and office space in the Fairpark Center for a proposed medical-equipment company, appellee Healthcare Essentials, Inc. Lawrence Williams conducted most of appellees' business dealings and would later testify

854

that the property was advertised as build-to-suit, with Bennett telling him that Tracy Hoskins would construct the space "however we wanted it." Williams viewed the property and met with Hoskins and Bennett to negotiate the lease terms. During this meeting, the parties discussed finish-out costs, and their versions of those discussions differ significantly.

According to Hoskins, the site chosen by appellees consisted of two bays (approximately 3600 square feet), and he told Lawrence Williams that he would furnish eight dollars per square foot, or approximately $28,000, to finish out the bays. Williams's recollection is as follows. He told Hoskins that appellees wanted a two-year lease, but Hoskins stated that, anytime he committed money for a finish-out, he required a five-year lease. Williams agreed to a five-year lease on that basis. He understood that Hoskins had a budget for the finish-out, but he was not told that any of the finish-out costs exceeding the budget would be charged to appellees.

Soon after the meeting, the parties executed a written lease dated December 23, 2006, setting forth a five-year term with initial rent of $4800 per month. The lease was drafted by Hoskins and stated that the tenants would receive possession on a certain date "or upon completion of Lessor constructed finish out." The lease did not mention any tenant responsibility for the finish-out costs.

In early January 2007, Hoskins received an architect's drawing of a floor plan for the two bays chosen by appellees. The drawing showed three office-type areas and a warehouse space. Based on the floor plan, Hoskins determined that the finish-out costs would be just under $65,000. In an email dated January 11, 2007, he informed Lawrence Williams of the finish-out costs and told Williams that the tenant's portion would be $36,873.

Williams responded that appellees would not pay for the finish-out costs and that he understood Hoskins would be responsible for the costs. Hoskins replied that he had mentioned several times during the parties' discussions that the finish-out allowance was approximately $28,000 for the two bays. He said, however, that he would contribute more and would accept from appellees, as the tenant's portion, a combination of a cash payment and an adjusted lease rate. Williams did not respond to Hoskins's offer.

During this time, real-estate agent Clinton Bennett contacted Williams and apologized for the confusion regarding the finish-out costs. Bennett suggested, as a solution, that Williams either scale back the construction or add the finish-out costs to appellees' rent payments. Williams subsequently emailed Hoskins and asked what cost savings he would realize if they did away with one of the offices. Apparently in response to this request, Hoskins asked his architect to prepare a scaled-down version of the floor plan for the two bays. When the plan was complete, Hoskins showed it to Williams and cautioned him that it would not "cure our entire budget problem" and would save only twenty percent at the most. He stated that the parties should "figure out how we are going to handle the overage; the tenant's portion." During the next few weeks, the parties exchanged emails regarding the availability of the space for move-in but made no further mention of the tenant's responsibility for the finish-out costs. In March 2007, Hoskins gave Williams the keys for move-in.

In a later email to Williams, Hoskins mentioned that the tenant's portion of the finish-out costs amounted to approximately $20,000. Hoskins received no direct response from Williams and began to ques-

tion whether appellees would pay the costs. Consequently, Hoskins proposed that the parties execute a revised lease to address the tenant's responsibility for the finish-out costs, and the parties met to discuss the matter in June 2007.

Again, the parties' versions of the meeting are in sharp conflict. Hoskins claims that the parties agreed that he would absorb a greater portion of the finish-out costs, about twelve dollars per square foot, and that appellees would pay the remainder as increased rent over a five-year period. Hoskins drafted a new lease to this effect, which called for appellees to pay an additional $318 per month in rent for five years. Williams denied that the meeting ended in an agreement, and he refused to sign the revised lease. Although he later proposed certain changes to the lease unrelated to the finish-out costs, neither Williams nor the other appellees ever executed the revised lease or paid any finish-out costs.

While the controversy over the finish-out costs was taking place, another conflict arose between the parties concerning the air-conditioning system in the leased space. Williams complained to Hoskins in March 2007, shortly after move-in, that the air conditioner was not cooling the space. Hoskins sent his property manager, Duane Kovach, and the air-conditioner installer, Abshier Heating and Air, to repair the unit, but, according to Williams, the problems persisted. In July and August 2007, Williams emailed Hoskins again, complaining that the extreme heat in the office (eighty-three degrees and eighty-five degrees on various days) made for miserable working conditions on the premises. Williams would also state, during trial, that he complained about the air-conditioning problems in person to Duane Kovach on an almost daily basis.

Hoskins responded to one of Williams's complaints by saying that he had asked Kovach to "hold off" on meeting with Williams about the air conditioning until Kovach could pick up an executed copy of the revised lease. In another response to Williams's complaints, Hoskins proposed either closing off the air-conditioner vents in the warehouse in order to make the office cooler or adding another unit to cool the warehouse. Williams expressed an interest in adding another unit, but Hoskins did not provide the unit. Instead, in September 2007, Hoskins emailed Williams that, because the weather was cooler, the air conditioner should be able to "keep up" and that he would revisit the issue the following summer. He also told Williams that he had "put together an invoice for your portion of the tenant finish-out costs, which I have no doubt you'll object to" and that the parties needed to get their "current situation," meaning the finish-out costs, resolved. Based on these emails and the earlier email in which Hoskins asked Kovach to delay meeting with Williams, Williams believed that Hoskins was refusing to fix the air conditioner until the finish-out costs were paid or the revised lease was signed.

As fall and winter approached in 2007, Williams began to experience problems with the heat in the building. He did not email any complaints to Hoskins but purportedly addressed the issue with Kovach in person. Williams also began experiencing noise problems with a daycare center that had rented the space next door, and he claimed that he informed Hoskins, Kovach, and Clinton Bennett about these problems, to no avail.

In January 2008, Williams hired an attorney to put Hoskins on formal notice of the heating, air-conditioning, and noise problems. The attorney requested a viable plan from Hoskins to correct the prob-

lems within seven days or appellees would vacate the premises. Hoskins did not submit a plan but turned the matter over to Duane Kovach, who concluded that the heating-and-air-conditioning system was operable and that there was no excessive noise on the premises. Hoskins's attorney reported these findings to Williams's attorney on January 29, 2008, and provided no plan to address the alleged problems. Williams's attorney therefore advised appellees to move from the premises, which they did at the end of January 2008. Thereafter, appellees leased another, less-expensive property.

As a result of the above events, appellants sued appellees on December 17, 2008, for breach of contract and promissory estoppel, seeking damages for appellees' failure to pay rent |₇after January 2008 and failure to pay a portion of the finish-out costs.[1] Appellees asserted that they had not promised to pay for the finish-out costs and that appellants themselves breached the lease by failing to repair the heating-and-air-conditioning system and failing to address the excessive-noise issues. Following a two-day bench trial, the circuit court found in favor of appellees. The court made extensive findings of fact, including that appellants had materially breached the lease by failing to repair the heater and air conditioner and address the noise issues, and that appellees had never promised to pay for the finish-out costs. Upon entry of judgment, appellants moved for a new trial, claiming that the court's

verdict was contrary to the preponderance of the evidence. The court denied the motion, and this appeal followed. Appellants' sole argument on appeal is that the circuit court erred in denying their motion for a new trial.

## II. *Standard of review*

▪ Both sides ask this court to apply the clearly erroneous standard in reviewing the denial of a new trial.[2] While we employ the clearly erroneous standard in reviewing a circuit court's findings of fact in a bench trial, *Poff v. Peedin,* 2010 Ark. 136, 366 S.W.3d 347, we are asked in this case to review only the circuit court's decision denying a new trial. The vast majority |₈of our cases recognize the abuse-of-discretion standard when reviewing the denial of a new trial in a nonjury setting. *Cochran v. Bentley,* 369 Ark. 159, 251 S.W.3d 253 (2007); *Jones v. Double "D" Props., Inc.,* 352 Ark. 39, 98 S.W.3d 405 (2003); *Whisnant v. Whisnant,* 68 Ark. App. 298, 6 S.W.3d 808 (1999); *White v. White,* 50 Ark.App. 240, 905 S.W.2d 485 (1995). We also apply the abuse-of-discretion standard in the analogous situation of a circuit court denying a motion to reconsider or set aside its judgment. *See Neal v. Farris,* 101 Ark.App. 375, 278 S.W.3d 129 (2008); *Sory v. Woodall,* 73 Ark.App. 344, 43 S.W.3d 765 (2001).[3] Based on these authorities, we review the circuit court's denial of a new trial in this case under the abuse-of-discretion standard. An abuse of discretion means discretion

1. At trial, appellants would seek $138,809.98 in unpaid rent and $19,080 in finish-out costs.

2. Appellants, in their opening brief, argue that we must reverse the circuit court's denial of a new trial if we find substantial evidence in support of their case against appellees. The substantial-evidence standard is not applicable here, but, even if it were, we would look to the evidence in support of the fact-finder's verdict rather than the evidence in

support of the appellants' case. *See Coombs v. Hot Springs Village Prop. Owners Ass'n,* 98 Ark.App. 226, 254 S.W.3d 5 (2007). In any event, appellants abandoned this argument in their reply brief.

3. The circuit court in this case likened appellants' new-trial motion to a motion for reconsideration.

improvidently exercised, *i.e.*, exercised thoughtlessly and without due consideration. *Vigneault v. Vigneault*, 2010 Ark. App. 716, 379 S.W.3d 566.

### III. *Breach of contract*

Appellants sought damages for breach of contract based on appellees' vacation of the leased premises a little more than one year into the five-year lease. Appellees defended on the ground that they were entitled to set aside their tenancy due to appellants' material breach of their obligations to repair the heater and air conditioner and resolve the noise issues created by other tenants. The circuit court agreed with appellees, essentially finding that appellants had constructively evicted appellees and had been the first to breach the lease. Appellants moved for a new trial, which the circuit court denied after carefully considering each of appellants' points. We find no abuse of discretion in the court's decision.

■ Conduct by a landlord that effectively deprives the tenant of the use and benefit of the premises amounts to a constructive eviction. *See Fletcher v. Pfeifer*, 103 Ark. 318, 146 S.W. 864 (1912). What particular acts or omissions by the landlord amount to a constructive eviction cannot be defined by a general rule and depend on the facts of each case. *See id.* The landlord's conduct must be such that it will prevent the tenant's use of the premises for the particular purposes for which it was leased. *See id.* Constructive eviction depends on the materiality of the deprivation. *See id.* Similarly, the concept of first breach recognizes that a breach of a lease by one contracting party may release the other party from its contractual duties if the first breach is material and sufficiently serious. *Conway Commercial Warehousing, LLC v. FedEx Freight East, Inc.*, 2011 Ark. App. 51, 381

S.W.3d 94. In particular, if a landlord breaches his contract to repair or make improvements, the tenant may treat the relations at an end. *Franks v. Rogers*, 156 Ark. 120, 245 S.W. 311 (1922).

■ Here, the contract in question, the parties' lease, provided that appellees would have quiet and peaceful possession of the premises and that all improvements, including the air conditioning, would be kept in good and substantial working order and repair by appellants. At trial, appellees offered proof that their decision to quit the premises was occasioned by appellants' breach of the lease provisions regarding repairs and quiet enjoyment; that the breach was material, causing them severe discomfort and disruption in their work; and that appellants did not address the heating-and-air-conditioner issues and noise issues in a timely or serious fashion, despite appellees' complaints. Based on this evidence, the circuit court made its findings in favor of appellees and was within its discretion in refusing to set those findings aside.

Appellants argue, however, that the evidence showed no breach on their part and that appellees' actions belied any right to claim a breach of the lease. Appellants first contend that appellees made no significant protests about the condition of the premises because they sent no written complaints at all regarding the heater and no written complaints about the air conditioner in the months of April, May, and June 2007, or after September 2007. Appellants are correct that appellees' written complaints were sparse, but Lawrence Williams testified that he made numerous, almost daily oral complaints about the heater, air conditioner, and noise to Hoskins or Duane Kovach. The conflict in the evidence on this point was a matter for the circuit court to resolve, and it did so in

favor of appellees. *See Kuelbs v. Hill,* 2010 Ark. App. 427, 379 S.W.3d 47.

Appellants also argue that appellees were responsible for the heating and air-conditioning problems because they set the thermostat improperly or left the back doors of the premises open. There was, however, conflicting proof on this point. Appellees presented an expert witness who testified that the air-conditioning system was insufficient in numerous respects, and Lawrence Williams testified that it was Hoskins who suggested opening the back doors. Further, Hoskins admitted in one of his emails that he never expected the air-conditioning unit to be adequate to cool the entire leased space.

Appellants further contend that they responded to appellees' complaints by sending Duane Kovach and Abshier Heating & Air to address the air-conditioning problem and by offering appellees the option of closing off the warehouse vents or adding another air-conditioning unit. Appellants did not, however, correct the air-conditioning problem between March and September 2007, and Hoskins stated that he would not address the problem further until the following summer. Hoskins also indicated that appellees must sign a revised lease agreement or pay for the finish-out costs before the air-conditioner problems were resolved. The conflicts in the proof, or the inferences to be drawn therefrom, were resolved by the circuit court in favor of appellees.

Additionally, appellants argue that appellees' true reason for vacating the premises was to obtain a less-expensive rental. Appellees rented a new space in February 2008 for less money, but appellants did not show that appellees' motives in leaving Fairpark were necessarily economic. Appellees had complained for many months about the air-conditioning problems and received no satisfaction during that time.

In January 2008, they engaged an attorney, who, prior to advising appellees to leave the premises, asked appellants to propose a solution to their problems. It was only when appellants failed to offer a solution that appellees vacated the premises. Appellants claim alternatively that appellees could have made the repairs themselves and charged them to appellants rather than abandoning the leasehold. However, appellants cite no authority for the proposition that appellees were required to exercise that option. Moreover, *Franks, supra,* states that where a landlord breaches its contract to repair or make improvements, the tenant may treat the relations at an end.

Finally, appellants argue that appellees failed to vacate the premises within a reasonable time because their last written communication about the air conditioner was in September 2007 and they waited until January 2008 to leave the property. Appellants cite *Trace X Chemical, Inc. v. Highland Resources, Inc.,* 265 Ark. 468, 579 S.W.2d 89 (1979) (Fogleman, J., dissenting), and the authorities mentioned therein for the proposition that a tenant's right to claim constructive eviction will be lost if he does not vacate the premises within a reasonable time after his right comes into existence. We are not convinced that this point warrants a new trial. Lawrence Williams testified that he made frequent oral complaints to Hoskins or Kovach in addition to his written complaints. Thus, the proof did not necessarily demonstrate a four-month gap between appellees' last complaint and their leaving the property. Moreover, the evidence showed that new complaints arose after September 2007 regarding the heating and noise issues and that appellees' frustrated attempts to obtain satisfaction on those matters, as well as the air-conditioner

problem, led to their vacating the premises.

For these reasons, we affirm the denial of the new trial on appellants' breach-of-contract claim.

## IV. *Promissory estoppel*

 To prove promissory estoppel, a plaintiff must show that the defendant made a promise; that the defendant should have reasonably expected the plaintiff to act or refrain from acting in reliance on the promise; that the plaintiff acted or refrained from acting in reasonable reliance on the promise to its detriment; and that injustice can be avoided only by enforcement of the promise. AMI Civ. 2444 (2008). *See also Van Dyke v. Glover*, 326 Ark. 736, 934 S.W.2d 204 (1996). Appellants' promissory-estoppel claim is based on their contention that, when Lawrence Williams received Tracy Hoskins's emails in January 2007 |₁₃asking for a portion of the finish-out costs, and when appellees then allowed a revised, scaled-down version of the construction to go forward, appellees "gained an understanding" that appellants expected them to contribute to the finish-out costs. The circuit court found that, among other things, appellants' claim for promissory estoppel must fail because appellees did not promise to pay for the finish-out costs. The court allowed its findings to stand in denying appellants' motion for a new trial.

 On appeal, appellants argue that they met the key elements of promissory estoppel by proving a promise by appellees; an awareness by appellees that appellants would rely on the promise; and a benefit conferred on appellees as a result of appellants' reliance. We first observe that appellants' argument is very likely procedurally barred. The circuit court, in its extensive findings of fact, ruled not only that appellants failed to prove the elements of promissory estoppel but also that 1) promissory estoppel is not applicable where the parties have a formal contract, and 2) appellants were not damaged by paying the full amount of the finish-out costs because, on the basis of appellees' expert-witness's testimony, the finish-out costs should only have been $27,674—an amount less than appellants' $28,800 allowance.[4] Appellants do not challenge these rulings in seeking a new trial on appeal. When an appellant fails to challenge a circuit court's alternative, independent basis for its ruling, we will affirm. *See Casarreal v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 622, 2010 WL 3700209.

 In any event, the circuit court did not abuse its discretion in refusing to set aside its finding that appellants failed to prove the elements of promissory estoppel. The question of |₁₄whether promissory estoppel is applicable is for the trier of fact. *Dickson v. Delhi Seed Co.*, 26 Ark.App. 83, 760 S.W.2d 382 (1988). Here, the facts, while in some conflict, show that appellees denied liability for the finish-out costs and steadfastly refused to sign a new lease that attempted to impose those costs on them. While appellees may have given mixed signals to appellants as to whether they intended to share in the costs, the evidence does not clearly preponderate in favor of a finding that appellees promised to pay any part of the costs. A promise is an essential element of promissory estoppel, AMI Civ. 2444 (2008), and may be defined as a manifestation of intention to act or refrain from acting in a specified way, so made to justify a promisee in understanding that a commitment has been made. *Restatement (Second) of Contracts* § 2 (1981). In this case, appellees' communications to appel-

---

4. The construction was performed by a company owned by Tracy Hoskins.

lants were either vague in their implication that they would shoulder some of the costs or were overtly resistant to bearing the costs. Thus, it cannot be said beyond dispute that appellees manifested an intention to pay for the costs. Furthermore, it cannot be said beyond dispute that appellants justifiably believed appellees had committed to paying the costs. Tracy Hoskins testified that he knew he needed a signed, revised lease in order to amend the existing contract, which imposed no finish-out costs on appellees. Under these circumstances, we see no abuse of discretion in the circuit court's denial of a new trial.

Affirmed.

ABRAMSON and HOOFMAN, JJ., agree.